UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TYRONNE WELLS                               CIVIL ACTION

VERSUS                                      NUMBER: 11-0012

WARDEN BURL CAIN                            SECTION: "F"(6)

## <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing.   For the following reasons, it is hereby recommended that the instant petition be **DISMISSED WITH PREJUDICE**.

**PROCEDURAL HISTORY**[1]

Petitioner, Tyronne Wells, is a state prisoner who is presently incarcerated at the Louisiana State Penitentiary, Angola, Louisiana. On September 8, 2004, following a two-day jury trial in Orleans Parish Criminal District Court, petitioner was found guilty on the charge of aggravated robbery. On October 7, 2004, the district court sentenced petitioner to serve 15 years at hard labor. The State filed a multiple bill against petitioner and, at the conclusion of the multiple bill hearing on October 28, 2004, the district court found petitioner to be a fourth felony offender. On December 9, 2004, the district court sentenced petitioner to 40 years incarceration without benefit of parole, probation or suspension of sentence. On August 3, 2005, the Louisiana Fourth Circuit Court of Appeal affirmed petitioner's conviction, amended his sentence to delete the prohibition of parole eligibility, and affirmed his sentence as amended. *State v. Wells*, 915 So.2d 1050 (Table), No. 2005-KA-0334 (La. App. 4 Cir. 2005) (unpublished opinion).[2] On June 14, 2006, the Louisiana Supreme Court denied petitioner's writ application, *State v. Wells*, 929 So.2d 1267 (La. 2006), thereby rendering petitioner's conviction and sentence final. Petitioner's time for seeking review expired 90 days later, on September 12, 2006, when his time for filing a petition for a writ

---

[1]A portion of the procedural history was obtained from the Louisiana Fourth Circuit's opinion, *State v. Wells*, 915 So.2d 1050 (Table), No. 2005-KA-0334 (La. App. 4 Cir. 2005) (unpublished opinion).

[2]A copy of the state appellate court's unpublished opinion is contained in the State rec., vol. 4 of 8.

of certiorari with the United States Supreme Court expired.  *See* Sup.Ct.R. 13(1); *see also*
*Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999), *cert. denied*, 529 U.S. 1099, 120 S.Ct.
1834, 146 L.Ed.2d 777 (2000); *Habteselassie v. Novak*, 209 F.3d 1208, 1209 (10th Cir.
2000); *Harris v. Hutchinson*, 209 F.3d 325, 328 n.1 (4th Cir. 2000).

On August 2, 2007, petitioner filed an application for post-conviction relief which was
subsequently amended by counsel.[3]  On February 22, 2008, Orleans Parish Criminal District
Court Judge Terry Alarcon issued Judgment denying petitioner post-conviction relief.[4]  On
September 10, 2009, the state district court denied petitioner's application for
reconsideration.[5]  On October 22, 2009, the Louisiana Fourth Circuit denied petitioner's post-
conviction writ application, providing: "Relator's application for post-conviction relief was
timely filed.  The claims in his application have been reviewed and found to be without
merit.  The February 22, 2008 judgment of the District Court is correct."  *State v. Wells*, No.
2009-K-1332 (La. App. 4 Cir. 2009) (unpublished opinion).[6]  On November 12, 2010, the
Louisiana Supreme Court likewise denied petitioner post-conviction relief.  *State ex rel.*

---

[3]A copy of petitioner's amended post-conviction application is contained in the State
rec., vol. 2 of 8.

[4]A copy of the state district court's February 22, 2008 Judgment is contained in the State
rec., vol. 2 of 8.

[5]*See* State rec., vol. 1 of 8, docket master, p. 4.

[6]A copy of the state appellate court's October 22, 2009 unpublished opinion in contained
in the State rec., vol. 7 of 8.

*Wells v. State*, 49 So.3d 881 (La. 2010).

Petitioner deposited the instant habeas corpus application for mailing to this court on December 7, 2010.[7]  In his habeas application, petitioner raises the following claims:  1) Counsel was ineffective due to his failure to object to the admission of prejudicial hearsay testimony; 2) the trial court erred in allowing hearsay testimony to be presented to the jury regarding the identity of petitioner as the perpetrator; and, 3) the trial court erred in accepting an unresponsive verdict of aggravated battery to the charged crime of aggravated robbery.  The State concedes that petitioner has exhausted his state court remedies as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982).  (Rec. doc. 8., State's Response, p. 22).  The State, however, contends that the instant matter is untimely.  (Rec. doc. 8, State's Response, pp. 6-18).  Based upon the discussion set forth below, the court disagrees.

## TIMELINESS

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a petitioner is required to bring his habeas corpus claims pursuant to 28 U.S.C. § 2254 within one year from "the latest of -"

---

[7]A copy of the pertinent mailing envelope containing the "Dec - 7 2010" post-mark date is attached to petitioner's habeas application.  Under the "mailbox rule", a pleading filed by a prisoner acting *pro se* is considered to be filed for prescriptive purposes on the date it is delivered to prison officials for mailing, rather than the date it is received by the court.  *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).  This delivery date is often evidenced by the transmittal envelope's post-mark date.

(**A**) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(**B**) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(**C**) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(**D**) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1) (West 2011).

As set forth above, petitioner's conviction became final on June 14, 2006, and his time for seeking review expired 90 days later, on September 12, 2006, when his time for filing a petition for a writ of certiorari with the United States Supreme Court expired.   Thus, petitioner had a year from September 12, 2006, or until September 12, 2007, to timely seek federal habeas corpus relief.

On August 2, 2007, 40 days before the expiration of his statute of limitations, petitioner filed with the state district court an application for state post-conviction relief, thereby tolling prescription.   Tolling then continued uninterrupted for the duration of the post-conviction proceedings, so long as petitioner sought supervisory review in a timely manner.   *Grillette v. Warden, Winn Correctional Center*, 372 F.3d 765, 769-70 (5th Cir. 2004).

The State argues that tolling ceased in this case upon petitioner's failure to timely seek review of the district court's February 22, 2008 decision denying his post-conviction application.[8]  In support of its argument, the State relies heavily on *Melancon v. Kaylo*, 259 F.3d 401 (5th Cir. 2001), wherein the United States Fifth Circuit determined that prescription ceased to be tolled when Melancon failed to timely seek post-conviction relief from the Louisiana Court of Appeal.  (Rec. doc. 8, State's Response, pp. 15-17).  Based upon the following, the court finds the State's reliance on *Melancon*, *supra*, is misplaced.

In *Grillette*, 372 F.3d at 774, the United States Fifth Circuit faced a situation wherein the petitioner's post-conviction writ application to the state appellate court was filed outside the 30-day deadline.   However, the *Grillette* court determined that prescription was nevertheless tolled, reasoning:

> [A]t no point did the state trial court or the Louisiana Court of Appeal fault Grillette for failure to comply with Rule 4-3.  Whereas in *Melancon,* the Louisiana Court of Appeal expressly indicated that Melancon's application "appeared untimely," in this case it is undisputed that the Louisiana Court of Appeal disposed of Grillette's application "on the merits," without any notation that his application was time-barred.  We acknowledge, as the State asserts, that a state court's consideration of an application "on the merits" is not by itself conclusive proof that the application was timely filed in accordance with that state's timeliness laws and rules and thus "pending."  *See [ Carey v.] Saffold,* 536 U.S. [214,] 226, 122 S.Ct. 2134 [ (2002) ] (noting different reasons why a court might "address the merits of a claim that it believes was presented in an untimely way").  Rule 4-3, however, prohibits the Court of

---

[8]Under Louisiana Uniform Rules of the Courts of Appeal Rule 4-3, petitioner had 30 days, until March 24, 2008, to timely file a writ application with the Louisiana Fourth Circuit Court of Appeal.

Appeal from considering the merits of an application that is not filed with the appellate court within the original or extended return date, "in the absence of a showing that the delay in filing was not due to the applicant's fault." Because the Court of Appeal did consider the merits of Grillette's application, it must have determined that the application was timely either because the trial court impliedly extended the return date and/or because the delay was not due to Grillette's fault.

Moreover, as Grillette correctly points out, when the denial of an application is based on untimeliness, Louisiana courts routinely and unmistakably indicate so in their opinions. *See, e.g., Carter v. Rhea,* 785 So.2d 1022, 1022 (La. Ct. App. 4th Cir. 2001) ("WRIT APPLICATION DISMISSED AS UNTIMELY."); *Lawyer v. Succession of Kountz Through Cupit,* 703 So.2d 233, 233 (La. Ct. App. 4th Cir. 1997) ("WRIT NOT CONSIDERED."); *Watts v. Dorignac,* 681 So.2d 955, 955 (La. Ct. App. 1st Cir. 1996) ("WRIT NOT CONSIDERED"). Thus, had the Louisiana Court of Appeal decided to reach the merits of the application notwithstanding a determination that the application was untimely, it appears that the court would have indicated any such untimeliness in its opinion.

*Grillette,* 372 F.3d at 775.

The instant matter is a step further removed from *Grillette*, in terms of providing a basis for tolling prescription. Unlike *Grillette* wherein the state appellate court made no comment regarding the timeliness of Grillette's post-conviction writ application, but simply ruled on the merits, in the instant matter the Louisiana Fourth Circuit Court of Appeal specifically determined that Wells' post-conviction application "was timely filed". *Wells*, No. 2009-K-1332. Based upon the above and, in an abundance of caution, this court will toll the statute of limitations despite the fact that petitioner's post-conviction writ application was not filed within the applicable 30-day period following the state district court's denial of

post-conviction relief.  *See* <u>Bourgeois v. Bergeron</u>, 2009 WL 5088756, *4 (E.D. La. Dec. 23, 2009) (court, "out of an abundance of caution," tolled prescription despite the fact that petitioner waited almost six years after the state trial court denied him post-conviction relief before filing a writ application with the state appellate court); <u>Newman v. Cain</u>, 2010 WL 1817771, *3 (E.D. La. April 12, 2010) (court, "out of an abundance of caution," tolled prescription despite untimeliness of petitioner's writ application to the Louisiana Fourth Circuit Court of Appeal).

Accordingly, in the matter at hand this court finds that prescription commenced to run again on November 12, 2010, when the Louisiana Supreme Court denied petitioner's writ application.  *State ex rel. Wells v. State*, 49 So.3d 881 (La. 2010).  Petitioner deposited the instant habeas corpus application for mailing to this court 24 days later, on December 7, 2010.  Thus, petitioner's federal habeas application is timely.  Accordingly, the court shall proceed to address the merits of petitioner's claims following its review of the pertinent facts and applicable standard of review.

## FACTS[9]

In the early afternoon of August 1, 2003, Irma White was robbed and beaten while she was walking in the 2300 block of N. Roman Street.  Ms. White testified that she had just

---

[9]The facts are taken from the Louisiana Fourth Circuit's opinion, *State v. Wells*, 915 So.2d 1050 (Table), No. 2005-KA-0334 (La. App. 4 Cir. 2005) (unpublished opinion).  A copy of the state appellate court's unpublished opinion is contained in the State rec., vol. 4 of 8.

cashed some checks at a store on Franklin Avenue and was walking back to her house on Elysian Fields Avenue.  She testified that she looked behind her as she neared the corner of Mandeville Street and she noticed a man right behind her with what looked like a white T-shirt tied around his head, covering his face below his eyes.  Ms. White testified that the man pushed her, and she fell to the ground on her stomach, with her purse landing underneath her body.  She stated that as she turned her head, the man hit her in the face twice and told her to "give it up."  She testified that when the man saw that her purse was underneath her, he turned her over.  They began struggling, and the T-shirt slipped off of the man's face.  The man tried to choke her, and Ms. White screamed for help.  The strap on her purse broke during the struggle, and the man grabbed the purse and fled.  Ms. White testified that she chased him through back yards in the block, but she lost him when he jumped a fence that she could not scale.

Ms. White testified that someone in the neighborhood called the police and called for an ambulance.  She testified that while she was chasing the robber, she heard a female voice identify the robber as Tyronne Wells, whom she did not know. When the police arrived, she spoke with officers at the scene, giving them this information and describing the robber.  She testified that she was then taken to a hospital where doctors reset her broken nose and tended to various other injuries she had, including a cut on her leg that she sustained while chasing the robber.  She testified that the day after the robbery, an officer showed her a photographic

lineup from which she positively chose the photo of petitioner, Tyronne Wells, as the man who robbed and beat her.  She denied that anyone forced or coerced her into choosing Wells' photo.

Ms. White testified that when her purse was stolen, it contained over $400 from the checks she had just cashed, a personal revolver she used in her job as a security officer, her identification, and her cell phone.  She testified that because this robbery occurred on a Friday, she did not cancel the cell phone account until Monday.  She admitted that she was bleeding from her wounds at the time of the robbery, but she insisted that she was able to see her assailant's face clearly and was able to chase him almost a block.  She testified that a few days after the robbery she had to return to the hospital to have the stitches in her nose redone.  In addition, she lost five teeth as a result of the beating.  Ms. White testified that she was positive that Wells was the man who robbed and beat her.

Detective Joseph Lanaise testified that he conducted the investigation of Ms. White's robbery, which he indicated occurred at approximately 12:50 p.m.  He testified that he spoke with Ms. White on the scene before she was taken to the hospital.  He testified that Ms. White had trauma to the head, her face was swollen, and her nose and temple were bleeding. He described her mental state as alert.  He stated that Ms. White described her assailant and told him that she heard a female voice on the scene identify the robber as Tyronne Wells. He stated that he interviewed people at the scene, but no one admitted telling Ms. White the

robber's identity.  He testified he ran the name through the computer, and petitioner's age matched the age description Ms. White gave him.  In addition, Wells' most recent address was not too far from the robbery scene.  Detective Lanaise testified that he compiled a photographic lineup including Wells' photograph, and from that lineup Ms. White positively identified Wells as the man who robbed and beat her.

The defense called Officer Willie Franklin, the officer who first responded to the call about the robbery.  After reading his police report, he testified that Ms. White was bleeding and had been beaten.  He testified that his report indicated that Ms. White told him that the T-shirt fell off of the robber's face as he fled the robbery, and that Ms. White stated that during the robbery and beating the robber's eyes were exposed.

Ms. Conchetta Smith testified that she lived in the 1400 block of Mandeville Street at the time of the robbery.  She stated that she saw Ms. White running through her back yard, and then she saw her walking in the street.  Ms. Smith testified she called 911 and gave Ms. White a towel and some ice for her wounds.  She indicated that Ms. White had blood in her eyes.  Ms. Smith testified that Ms. White described her assailant as being short.  Ms. Smith admitted she knew Wells from living in the neighborhood.

Tyronne Wells denied robbing Ms. White.  He admitted having prior convictions for possession of stolen property, possession of cocaine, and for distribution of cocaine, the last conviction for which he was on parole at the time of the robbery.  Wells testified that on the

11

day of the robbery he was attending a funeral, burial, and repast for his cousin.  He testified that he arrived at the funeral home on N. Claiborne Avenue sometime between 9:30 and 10:00 on the morning of the robbery.  He testified that the funeral started at 10:00, and after the funeral he accompanied the other mourners to the cemetery in eastern New Orleans.  From there, they went to his cousin's house at Pauger and Roman Streets for the repast, which he admitted was in the "neighborhood" and within walking distance of the robbery.  He estimated that he arrived at the repast at around noon, and he indicated that he did not leave his cousin's house until around 7:00 that night.  He testified that while he was at the house, someone called to tell him that he had been implicated in a robbery, but he stated that he did not go to the police to clear his name because of his prior experiences with the police.  He introduced the guest book from the funeral home which showed his signature.

Deidra Russell, Wells' aunt, testified that she too attended the funeral, burial, and repast.  She testified that she saw Wells at each of these events.  She testified that sometime after arriving at the repast, she got a phone call from someone in the neighborhood of the robbery informing her that Wells had been implicated.  She testified that she went to the scene and saw a woman with a towel around her face standing in the street and talking to the police.  Ms. Russell stated that she then heard "Ms. Lucille" tell the police that Wells committed the robbery.  Ms. Russell testified that when she returned to the repast, Wells was still there.

Dr. Ara Dozier, a retired school principal and Wells' great-great-aunt, testified that she also attended the funeral, burial, and repast.  She testified that Wells stood right behind her in line at the funeral home and signed the guest book right after she signed it.  Dr. Dozier testified that she also saw Wells at the cemetery and at the repast afterward.  Dr. Dozier estimated that the entourage left the funeral home for the cemetery at around 1:00 p.m.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).   The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we

have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams[ v. Taylor*, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## ANALYSIS

### Ineffective Assistance of Counsel

Petitioner argues that counsel was ineffective due to her failure to prevent the introduction of inadmissible hearsay evidence which identified him as the robber.  Petitioner raised this same claim in connection with his direct appeal.[10]  In addressing said claim, the Louisiana Fourth Circuit Court of Appeal first set forth the applicable law.

In *State v. Mims*, 97-1500, pp. 44-45 (La. App. 4 Cir. 6/21/00), 769 So. 2d 44, 72, this court discussed the standard to be used to evaluate an effective assistance of counsel claim:

---

[10]Petitioner also raised the claim on post-conviction, but the district court did not consider the merits of said claim in light of the fact that the issue had been addressed on appeal.

14

The defendant's claim of ineffective assistance of counsel is to be assessed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). *See State v. Fuller*, 454 So.2d 119 (La.1984). The defendant must show that his counsel's performance was deficient and that this deficiency prejudiced him. The defendant must make both showings to prove counsel was so ineffective as to require reversal. *State v. Sparrow*, 612 So.2d 191, 199 (La. App. 4 Cir. 1992). Counsel's performance is not ineffective unless it can be shown that he or she made errors so serious that he or she was not functioning as the "counsel" guaranteed to the defendant by the 6th Amendment of the federal constitution. *Strickland, supra,* at 686, 2064. That is, counsel's deficient performance will only be considered to have prejudiced the defendant if the defendant shows that the errors were so serious that he was deprived of a fair trial. To carry his burden, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 693, 2068.

*See also State v. Crawford*, 2002-2048 (La. App. 4 Cir. 2/12/03), 848 So.2d 615, writ den. 2003-1085 (La. 3/12/04), 869 So.2d 815. In addition, in *State v. Griffin*, 2002-1703, pp. 9-10 (La. App. 4 Cir. 1/15/03), 838 So. 2d 34, 40, writ den. 2003-0809 (La. 11/7/03), 857 So.2d. 515, this court noted:

This Court has recognized that if an alleged error falls within the ambit of trial strategy" it does not "establish ineffective assistance of counsel." *State v. Bienemy*, 483 So.2d 1105 (La. App. 4 Cir. 1986). Moreover, as "opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." *State v. Brooks*, 505 So.2d 714, 724 (La. 1987).

*See also State v. Myers*, 2004-1219 (La. App. 4 Cir. 11/3/04), 888 So.2d

15

1002 , writ den. 2004-2475 (La. 2/4/05), 893 So. 2d 85, and 2004-2946 (La. 2/4/05), 893 So.2d 86.

*State v. Wells*, No. 2005-KA-0334 at pp. 6-7.

Thereafter, the state appellate court reasoned:

> The appellant's defense was that Ms. White had misidentified him as the robber. He asserts that in addition to Ms. White's identification of him, three witnesses testified that someone on the scene of the robbery stated that the appellant was the robber. The appellant contends that the introduction of this hearsay evidence violated his Confrontation Clause rights, and his trial counsel was ineffective for her "failure to protect him against" this violation.
>
> In *State v. Huckabay*, 2000-1082, pp. 25-26 (La. App. 4 Cir. 2/6/02), 809 So. 2d 1093, 1108, this court discussed a defendant's right to confront his accusers:
>
>> An accused is entitled to confront and cross examine the witnesses against him. La. Const. art. 1, § 16. La. C.E. art. 611(B) provides that a witness may be cross-examined on any matter relevant to any issue in the case. Due process affords a defendant the right of full confrontation and cross examination of the State's witnesses. *State v. Van Winkle*, 94-0947, p. 5 (La. 6/30/95), 658 So. 2d 198, 201-202. . . . Further, confrontation errors are subject to the harmless error analysis so the verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial was surely unattributable to the error. *State v. Broadway*, 96-2659, p. 24 (La. 10/19/99), 753 So. 2d 801, 817.
>
> Here, the appellant argues that counsel was ineffective because she failed to prevent three witnesses from testifying that someone on the scene of the robbery named him as the robber. However, a reading of the transcript indicates that *his counsel elicited* almost all of these references in an attempt to discount Ms. Wells' identification of him by showing that once the officers learned his name, they really did no further investigation of the crime to determine whether, in fact, he actually committed the crime.
>
> At trial, the only evidence the State elicited concerning this identification was during the direct examination of Det. Lanaise, when he

16

testified that Ms. White "gave me the name of Tyronne Wells." On cross-examination, defense counsel asked Det. Lanaise how Ms. White knew her assailant's name, and in response Det. Lanaise stated that Ms. White said that she heard someone on the scene say that the appellant was the robber. Defense counsel then asked a series of questions about this identification and the officers' further actions in the investigation, including questions about whether the officers obtained a search warrant for the appellant's house after Ms. White identified him or whether they found Ms. White's stolen property in his possession. In addition, defense counsel questioned the detective concerning Ms. White's physical condition at the time he interviewed her on the scene, her ability to view her assailant's face that was covered with a Tshirt, and her possible use of pain medication at the time she viewed the photographic lineup. Counsel also brought out the fact that the officers were unable to find any witnesses on the scene who would admit having identified the robber.

Continuing in this vein, on direct examination Ms. White testified that she did not know her assailant at the time of the robbery. On cross-examination, defense counsel questioned Ms. White in some depth about her hearing a voice identify the appellant as the robber. Counsel also thoroughly questioned Ms. White about her physical condition during and after the attack, and further questioned Ms. White in some detail about the physical description she gave the police on the scene.

The defense further sought to discredit Ms. White's identification by questioning Off. Franklin about Ms. White's physical condition when he took her statement, about the description she gave him of the robber, and about her purported statement to him that her assailant's T-shirt fell off of his face during the chase, not during the struggle as she had testified. Similarly, defense counsel questioned Ms. Smith, the person who rendered aid to Ms. White and who called the police, concerning Ms. White's physical condition just after the robbery and the description she heard Ms. White give of the robber.

The last reference to any on-scene identification was also elicited by defense counsel. Counsel questioned Ms. Russell, the appellant's aunt, about her visit to the scene in response to a phone call she received. Ms. Russell described Ms. White as being covered in blood. In addition, the following colloquy occurred:

Q. Did you hear anything at all?
A. I heard Ms. Lucille tell the police officer
that it was Tiger.

> Q. Tiger?
> A. Tyronne.
> Q. Did she say Tyronne Wells?
> A. Yes, she did.

In his brief, the appellant attempts to portray the admission of the hearsay evidence as a failure on his counsel's part to block the introduction of this testimony. By contrast, a reading of the transcript indicates counsel actively sought to introduce this testimony to show that once the officers had a name for the suspect, they failed to investigate the matter further. Counsel extensively questioned both State and defense witnesses concerning Ms. White's physical condition in the wake of the robbery, her statements as to when the T-shirt fell from her assailant's face, and discrepancies in the various descriptions she gave to the police, all in an attempt to discredit Ms. White's identification and support the appellant's defense of misidentification. As such, counsel's elicitation of this hearsay evidence was trial strategy, which as per *Brooks* and *Griffin* does not establish ineffectiveness of counsel, even if the strategy was not ultimately successful.

*Wells*, No. 2005-KA-0334, pp. 8-11 (emphasis original).

As the Court explained in *Bell v. Cone*, 535 U.S. 685, 698, 122 S.Ct. 1843, 1852, 152 L.Ed.2d 914 (2002), *quoting Strickland*, 466 U.S. at 689, 104 S.Ct. at 2052 (additional quotation omitted), in order to attain habeas corpus relief, a petitioner "must overcome the 'presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" Based upon the above, this court finds that petitioner has not overcome this presumption. Thus, his ineffectiveness claim is without merit.

**Trial Court Erred in Admitting Hearsay Evidence**

Petitioner argues that the trial court erred in allowing the introduction at trial of hearsay testimony. As set forth above, Ms. White informed at trial that while she was

18

chasing the man who robbed her, she heard a female voice identify the robber as Tyronne Wells.  Detective Joseph Lanaise testified that Ms. White informed him that she heard a female voice on the scene identify the robber as Tyronne Wells.  Thereafter, Wells' aunt, Deidra Russell, testified that she heard "Ms. Lucille" tell police that Wells had committed the robbery.  Petitioner asserts that his constitutional rights were violated because he was never allowed to cross-examine these alleged witnesses who identified him as the robber.

It is well established that federal habeas review is limited to questions of constitutional dimension.  *See generally Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992), *cert. denied*, 508 U.S. 978, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993); *Castillo v. Johnson*, 141 F.3d 218, 222 and 224 (5th Cir.), *cert. denied*, 524 U.S. 979, 119 S.Ct. 28, 141 L.Ed.2d 788 (1998).  In reviewing a state trial court's alleged evidentiary errors, such as the ones set forth by petitioner, the federal habeas court's role "'is limited to determining whether a trial judge's error is so extreme that it constituted denial of fundamental fairness.'"  *Andrade v. McCotter*, 805 F.2d 1190, 1193 (5th Cir. 1986), *quoting Mattheson v. King,* 751 F.2d 1432, 1445 (5th Cir.1985).

Under the Sixth Amendment, a criminal defendant has the right "to be confronted with the witnesses against him."  *Coy v. Iowa*, 487 U.S. 1012, 1015 (1988).  The Confrontation Clause generally bars witnesses from reporting the out-of-court statements of nontestifying declarants.  *See Crawford v. Washington*, 541 U.S. 36, 54-56 (2004).  However, for the

following reasons, habeas relief is not warranted by virtue of the admission of the above hearsay testimony and petitioner's inability to cross-examine these alleged witnesses who identified him as the robber.

First, as the Louisiana Fourth Circuit noted above, petitioner failed to object to the inadmissible hearsay testimony.[11]   Rightfully, a petitioner forfeits his claim of a Confrontation Clause violation if he fails to object to the inadmissible hearsay testimony. *See Moya v. Sullivan*, 2010 WL 1023940, *8 (C.D. Cal. Jan. 22, 2010) (Nakazato, MJ.), adopted, 2010 WL 1023943 (Phillips, J.) (failure to object in the trial court on confrontation grounds prevents State from attempting to overcome objection by producing absent declarant).

Second, and most significantly, Confrontation Clause violations are subject to harmless error analysis. *Brecht v. Abrahamson***,** 507 U.S. 619, 653 (1993), *citing Coy v. Iowa*, 487 U.S. 1012, 1021-1022 (1988).  As such, the issue to be resolved "is whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 637, *quoting Kotteokos v. United States*, 328 U.S. 750, 776 (1946).

Petitioner cannot show that the admission of the hearsay statements had a "substantial and injurious" effect upon the verdict in light of the strong evidence against him, in particular the victim's unequivocal identification of petitioner from a photographic lineup as the man

---

[11]Specifically, the state appellate court noted that the hearsay testimony was elicited by defense counsel.  *See* discussion *supra* at pp. 17-18.

who robbed her, along with her in-court identification of petitioner.  Specifically, the victim,

Irma White, testified at trial:

> Q.  Were you able to identify anyone?
> A.  Yes, I was, immediately.
> Q.  Who is that?
> A.  That's Tyronne Wells.
> Q.  Do you see that person in the courtroom today?
> A.  Yes, I do.
> Q.  Can you describe him?
> A.  That's him right there in between the two ladies.
> MR. LEGIER [prosecutor]:
>      Let the record reflect that the victim has identified the defendant as the
> perpetrator.[12]

### Trial Court Erred in Accepting Unresponsive Verdict

Petitioner argues that the trial court erred in accepting the jury's guilty verdict on the

charge of aggravated battery, a verdict that is unresponsive to the charged offense of

aggravated robbery.  However, a review of the pertinent evidence reflects that petitioner's

claim is baseless.

First, in addressing this claim in connection with petitioner's post-conviction

application, the state trial judge acknowledged that in initially reading the jury's verdict, he

mis-spoke, stating that the jury had returned a verdict of guilty on the charge of aggravated

battery.  However, an investigation of the matter showed that the jury had, in fact, returned

---

[12]State rec., vol. 2 of 8, trial transcript, p. 29, lines 4-15.

a valid verdict of guilty on the charge of aggravate robbery.[13]  A review of the transcript of

September 8, 2004, a copy of which petitioner has attached to his supporting memorandum,

supports the above determination.  Specifically, the transcript reflects the following colloquy:

> THE COURT:
>> "The Court has reviewed the verdict form and find[s] it to be correct in
> form and responsive to the Bill of Information
>> We the jury find the defendant, Tyronne Wells guilt of aggravated
> battery, New Orleans, Louisiana, September 8, 2004, signed Ms. Dietra Lewis,
> foreperson.
>> Ladies and gentlemen, that is your verdict; right?
>
> THE JURY:
>> Yes.
>
> THE COURT:
>> Thank you very much for your time and consideration.  If I can help you
> during the remainder of your stay please let me know.
>> Mr. Reed will escort you out and you will be escorted to your car.
>> Good luck to you and thank you very much for your time."
> (Jury has been dismissed and is leaving at this time)
>
> MS. RENFROE [DEFENSE COUNSEL]:
>> "Thank you for your service....
>
> THE COURT:
>> "We will have sentencing one week from tomorrow, Ms. Renfroe, that
> will be the 16th."
>
> MS. RENFROE:
>> "The 16th, Judge, that's fine."

---

[13]*See* state trial court's February 22, 2008 Judgment, a copy of which is contained in the
State rec., vol. 2 of 8.

THE COURT:
    "Okay."

MR. LEGIER [PROSECUTOR]:
    "Judge, you said the verdict was aggravated battery."

THE COURT:
    **"Aggravated robbery, I'm sorry.  I was looking at the wrong form."**

MS. RENFROE:
    "They did come back as charged; right?"

THE COURT:
    **"Yes, aggravated robbery, 11 to 1, guilty as charged."** [Emphasis added.]

The fact that the jury returned a proper guilty verdict on the charge of aggravated robbery is further confirmed by a review the verdict which reflects:  "We, the jury, find the defendant:  <u>Tyrone [sic] Wells</u>, guilty of **aggravated robbery**. [Emphasis added.]"[14] Accordingly;

## <u>RECOMMENDATION</u>

It is hereby **RECOMMENDED** that the instant application for federal habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on

---

[14]A copy of the jury's verdict is contained in the State rec., vol. 2 of 8.

appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. §636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996)(*en banc*).[15]

New Orleans, Louisiana, this __10th__ day of ____May____, 2011.

LOUIS MOORE, JR.
United States Magistrate Judge

---

[15]*Douglass* referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.